FILED
2013 Oct-22  AM 11:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

JAMES MANUAL,

     Plaintiff,

vs.                                  CASE NO. CV-12-J-973-NE

CHARTER FOODS, INC., d/b/a
LONG JOHN SILVER'S,

     Defendant.

## MEMORANDUM OPINION

Pending before the court is the defendant's motion for summary judgment (doc. 17), a brief in support of said motion (doc. 18) and evidence (doc. 17). Plaintiff filed a response (doc. 22), and further evidence (doc. 21), and the defendant thereafter submitted a reply (doc. 26). Also pending is the plaintiff's motion to strike (doc. 24), which the court shall grant by separate Order.

## I. Factual Background

The plaintiff filed suit for violations for Title VII and 42 U.S.C. § 1981, asserting that the defendant discriminated against him due to his race (African-American) and retaliated against him, in further violation of these statutes. According to his EEOC charge (doc. 17-1 at 33), this lawsuit concerns both plaintiff's treatment

by a coworker while employed by defendant, as well as his termination on February 16, 2011.

The plaintiff was hired as an assistant manager by defendant in July 2009 by Amanze Nwokochah, the district manager.  Plaintiff depo. at 12, 18, 30.  Several weeks later, Kevin Leeper was also hired as an assistant manager.  *Id.* at 12, 14.  Leeper used racist words and terms on an ongoing basis.  Plaintiff depo. at 12; plaintiff declaration, ¶ 2.  Plaintiff complained to Steven Clark, the general manager.  Plaintiff depo. at 12-13; plaintiff declaration, ¶ 5.[1]  Clark took no action and in fact laughed at many of the comments Leeper made.  *Id.*

According to defendant's chain of command, employees reported to assistant managers, and they went to the general manager.  Over the general manager (Clark), was the district manager,[2] and over the district manager was the operations manager, James Fultz.  Plaintiff depo. at 16; Fultz depo. at 6-7.

The plaintiff asserts that Leeper told people he would get plaintiff fired.  Plaintiff depo. at 36; plaintiff declaration, ¶ 3.  At one time, Leeper wanted to place

---

[1]Plaintiff's declaration contains two paragraphs numbered "5."  The court cites to the first of these, which begins on page 2 of the declaration.

[2]When plaintiff was hired, Amanze Nwokochah was the district manager or district coach. Fultz depo. at 7.  All testimony about him refers to him as "Amanze" and the court shall do the same.  At some point, he was replaced by Don Crockett.  Plaintiff depo. at 30.  Crockett was then replaced by Missy Lyons.  Plaintiff depo. at 31.; *see also* doc. 17-1, at 39.  At the time of her deposition, Missy Lyons had married and changed her name to Missy Neal.  However, the court refers to her as "Lyons" in this opinion, but cites to her deposition as "Neal.".

a counterfeit bill in plaintiff's cash drawer, but someone else working there said not to do that.  Plaintiff depo. at 36-37.  Leeper also removed money from plaintiff's cash drawer in an attempt to get plaintiff fired, but someone saw him so he put it back.  *Id.* at 37.  The plaintiff reported this to Clark.  *Id.* at 37-39.  Because Clark took no action, plaintiff went to Amanze, who called Fultz.  *Id.* at 38.  Fultz claimed he never heard anything from plaintiff about cash handling procedures.  Fultz depo. at 25.

After Amanze was replaced by Crockett, the plaintiff also complained to Crockett about Leeper.  Plaintiff's declaration, ¶ 5.[3]  Crockett told Clark the treatment of plaintiff needed to stop, but Clark did nothing.  *Id.*  Similarly, the plaintiff complained to Lyons about Leeper's treatment of him.  *Id.*, ¶ 6. Although Lyons told him she would look into it, nothing changed.  *Id.*  The plaintiff also reported to Lyons that money from the drive-through was being manipulated.  Neal depo. at 20.  However, she found no evidence of voids or shortages from the drive through.  *Id.* at 20-21.  She asked plaintiff for written statements from witnesses about these shortages, but he never produced any.  *Id.* at 21-22.  According to Lyons, plaintiff never complained to her about Leeper, racial discrimination, or about being called names.  Neal depo. at 24-25.  Similarly, Clark never heard plaintiff complain about

_____

[3]This citation is to the second paragraph 5 in plaintiff's declaration, contained on page 3 of the same.

Leeper making racist remarks, and said plaintiff only told him Leeper called him "stupid."[4]  Clark depo. at 67-68.

According to plaintiff, Leeper referred to plaintiff as a "black African monkey," and asked, "Who do you think you are to come to this country and work in this place here?"[5]  Plaintiff depo. at 48.  He also told plaintiff, "I wish they would kill you in this place here, kill Obama," and "I will get you fired."  *Id.* at 48.  Leeper also accused plaintiff of assaulting him.  *Id.* at 57.  Leeper made a comment to plaintiff about plaintiff's wife, and when plaintiff reported it to Amanze, Leeper asserted plaintiff assaulted him.  *Id.* at 57-59.  Plaintiff was told if he did not sign the ensuing write-up he would be fired, so he signed it.  *Id.* at 59; exhibit 6 to plaintiff depo., doc. 17-1 at 62.  Leeper was also given a similar write-up at the same time.  Doc. 17-1 at 64; Fultz depo. at 9-10.  Due to the ongoing conflict between Leeper and plaintiff, in February 2010 Amanze undertook an investigation. Fultz depo. at 8-9.  Statements taken from other employees during this time period reflect an ongoing conflict between plaintiff and Leeper.  See e.g, exhibit 8 to plaintiff depo., doc. 17-1 at 69-78,

---

[4]Although Clark testified that 70 percent of the crew and managers at the Huntsville store were black, a spreadsheet listing all store employees and their positions reflects that plaintiff was the only black manager at the Huntsville location from February 1, 2010, until March 31, 2011, the dates for which this information was submitted.  *See* Clark depo. at 69; doc. 17-1 at 184. That same document reflects that of the three employees terminated during that time period, all three of them were black.

[5]The plaintiff is from Liberia.  He came to the United States at age 20 for college. Plaintiff depo. at 6-7.

4

82-123, 132-135.  Because Leeper was unhappy with the results of the investigation, Fultz asked to have questionnaires completed.  Fultz depo. at 13.  At one point Fultz and Amanze came to the store to try to get plaintiff and Leeper to get along better, but Leeper still would not speak to plaintiff.  Plaintiff depo. at 70-71; doc. 17-1 at 40-41.  Plaintiff asked Clark about it, who told him Leeper did not like him and then laughed about it.  Plaintiff depo. at 71.

Plaintiff complained to his manager, and then his district manager about the discrimination.  Plaintiff depo. at 79.  Fultz asserts that the plaintiff never complained to him about any racial remarks.  Fultz depo. at 18.  Although plaintiff stated he had heard racial remarks in completing the form Fultz created in February 2010, Fultz never asked the plaintiff what those remarks were.  *Id.* at 19-20.

Leeper was disciplined in October 2009 for padding inventory, which resulted in a warning.  Doc. 17-1, at 212.  He was never disciplined for being short on cash, and Clark had no knowledge of Leeper not following cash handling procedures, or borrowing money from the safe.  Clark depo. at 13, 79.

According to the plaintiff, he was terminated for not following company policy in counting money from the safe when opening the store.  Plaintiff depo. at 19.  Policy required that two people be present when counting money from the safe.  *Id.* at 20.  On the day before he was fired, February 15, 2011, he checked the computer

5

to see how much money should be in the safe.  Plaintiff declaration, ¶ 9.  He opened the safe and one of the drop bags from the prior evening was missing.[6]  Plaintiff depo. at 19.  He added the listed money drops from the drop sheet and all the money was there except for the final drop, which was not listed on the sheet.  Plaintiff declaration, ¶ 9.  Leeper had been the manager working the night before.  *Id*.

A cashier was there, but did not watch him count the money.  Plaintiff depo. at 25-26.  He called Clark around 10 a.m. and told him about the shortage and that Leeper had not made the drop the night before.  Plaintiff declaration, ¶ 9.  Clark came in later in the day to look for the missing money, and also called Missy Lyons, the district manager.  Plaintiff depo. at 19; Neal depo. at 68; Clark depo. at 73.  When Clark got there, plaintiff showed him the drop sheet with no signature and no witness signature.  Plaintiff declaration, ¶ 9.  Clark relayed this same information to Lyons. *Id*.  Clark showed plaintiff the security video from the night previous on which Leeper is not seen making the night drop.  Plaintiff declaration, ¶ 9.

The plaintiff asked Lyons to review the security video to see if Leeper placed the money in the safe, but she responded that it was not important.   Plaintiff depo.

---

[6]Because the safe locks from 8:00 p.m. until the next morning, money received after that is "dropped" into the safe through a drawer.  Neal depo. at 30-31.  Store policy required someone to be present when money was counted for verification.  *Id.* at 30, 32.

at 20.  He also told Lyons he had never been short on money before.  *Id.* at 23.  Lyons

was not physically present in the restaurant that day.  Neal depo. at 75-76.

Clark told Lyons that plaintiff did not have anyone verify his count.[7]  Neal

depo. at 70.  He claims he was told from the other employee working that morning

that when she came in at 8:00 a.m., the plaintiff already had the money in bags and

told her he was missing $471.  Clark depo. at 74.  Fultz got a call from Lyons stating

the restaurant was short $426.00 when plaintiff counted the money.[8]  Fultz depo. at

26.  He asserts the first question he asked was whether plaintiff followed procedure,

and whether the money had been double verified the night before.[9]  *Id.* at 26.  Lyons

informed Fultz that plaintiff did not follow procedure because no one watched him

---

[7]According to plaintiff, he reported to Lyons, Amanze, Crockett and Fultz that Leeper and Clark were taking money from the safe.  Plaintiff depo. at 21-22.  When Crockett found out Clark and Leeper were using money from the safe, he created a procedure that required counting the money in the safe, writing it down on a log sheet, then giving the money to the person watching you to count it, and then both  signed the log sheet.  Plaintiff depo. at 26-27, 29.  According to plaintiff, no manager followed this policy.  Plaintiff depo. at 29; plaintiff's declaration, ¶ 8.  Plaintiff also reported this failure of the other managers to Lyons.  Plaintiff's declaration, ¶ 8.  The plaintiff told Lyons and James Fultz that Clark and Leeper were not following this procedure, but nothing was done about it.  Plaintiff depo. at 35.  According to Lyons, she was unaware of other managers doing a morning count without having it verified.  Lyons depo. at 88-89.

[8]Although the exact amount of money missing is neither relevant nor contested, the amount is represented to be $426.00 in some pleadings, $471.00 in other pleadings, and $476.60 in yet other pleadings.  The court makes no factual finding as to which amount is correct.

[9]The defendant uses a form which is completed during the day to record money drops, deposit amounts and money counts.  The form contains a place for a second person to initial that the count was verified.  Neal depo.. at 74-75.  These forms are not retained.  Neal depo. at 74-75; Clark depo. at 55, 58.

count the money in the morning, but that it had been followed the night before. *Id.* at 26; Neal depo. at 27-28. She recommended terminating plaintiff because of the amount of the shortage and the failure to follow procedure. Neal depo. at 67. Since the shortage was so large, Fultz had "no choice but to terminate." Fultz depo. at 26.

According to plaintiff, when they looked at the video, he did not see Leeper putting the money in the safe. Plaintiff depo. at 21. He also testified that Leeper had not signed to drop log sheet the evening before. However, Clark testified that on the video Leeper and another employee walked to the safe, put the money in the envelope, dropped it, and signed the sheet. Clark depo. at 78.

The following day, the plaintiff was told to come to the store to see Lyons. Plaintiff depo. at 20; Neal depo. at 76-77. When he got there, Lyons told him opening the safe by himself violated company policy, and terminated him. Plaintiff depo. at 20. Although Lyons did not remember whether she spoke with plaintiff, she did remember him asking to review the video from the night before. Neal depo. at 76-77. She does not remember plaintiff asserting that the night drop had not been witnessed. Neal depo. at 78-79. Lyons did so before plaintiff came in that day, to make sure someone had verified the drop. Neal depo. at 77-78. However, she does not remember if she reviewed the form with the drops from the night before. Neal depo. at 77.

Confusingly, when asked what her investigation involved, Lyons answered that, in addition to looking at the video tape from the night before, she got statements "from other people."  Neal depo. at 82. However, Lyons also testified she only had one statement, from Amanda Young, and defendant could not locate it.  *Id*. at 82-83.  Clark had told Amanda Young to write, then type her statement and sign it.  Clark depo. at 74-75.  Both copies of that statement were given to Lyons, and Clark never saw either of them again.[10]  *Id*. at 75.  The log sheet from the previous evening was also given to Lyons.  *Id*. at 94.

According to Clark, at least two people were always scheduled.  Clark depo. at 22, 25-26.  If there was not a second employee present when the manager got to the store in the morning, the manager had to wait to count the money until the second person arrived.  *Id.* at 22-23.

Clark stated that the video showed the plaintiff with two bags in his hand.  Clark depo. at 65, 72, 81.  Plaintiff asserts this simply is not true.[11]  Plaintiff

---

[10]Although both Clark and Lyons testified in their depositions as to what Amanda Young told them, the court declines to accept Clark and Lyons' testimony of what Amanda Young said plaintiff said to her as evidence.  The same is triple or quadruple hearsay, and as such due to be stricken.  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer,* 193 F.3d 1316, 1322 (11th Cir.1999) (citations omitted).

[11]In *Evans v. Stephens,* 407 F.3d 1272 (11th Cir.2005) (en banc), the Eleventh Circuit held that the court should not consider for summary judgment purposes even non-hearsay testimony of a witness that is more favorable on a factual issue than the nonmoving party's own testimony. On that occasion the Eleventh Circuit explained that

declaration, ¶ 10.  Clark testified the video was placed onto a CD several days after plaintiff's termination and given to Fultz or Lyons.  Clark depo. at 65-66.  Clark also called the police to watch him search everyone's car, but nothing was found in any of the cars.  *Id.* at 72-73.  By the time he did this however, plaintiff had already gone to the bank and returned to the store.  *Id.* at 73, 75.  Clark does not believe that plaintiff stole the money, but does think it was done to get Leeper in trouble because "they hated each other since the first day they got there."  Clark depo. at 76.  Leeper was the manager the night before.  Clark depo. at 77-78.   He was not written up for this incident because the video showed him doing everything he was supposed to do. Clark depo. at 77-78.

Plaintiff told all the managers did what he did.  Plaintiff depo. at 20.  He testified that Clark, Leeper, Tabitha (Collins, shift leader), and Joey all counted cash without following the verification procedures.  Plaintiff depo. at 32-33, 45, 47; doc.

---

we accept the nonmovant's version of the events when reviewing a decision on summary judgment. When the nonmovant has testified to events, we do not ... pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Id.* at 1278 (footnote omitted) (citing *Draper v. Reynolds*, 369 F.3d 1270, 1272 (11th Cir.2004); *Rowe v. Ft. Lauderdale*, 279 F.3d 1271, 1279 n. 9 (11th Cir.2002)).

17-1 at 246.  He knew this because there was no second signature verifying the cash count on the drop sheets.  Plaintiff depo. at 33, 34-35, 40.  Lyons does not recall plaintiff saying this.  Neal depo. at 78-79.  However, if that had been the case, than both Leeper and plaintiff would have been terminated.  Neal depo. at 80-81.

In its response to the EEOC, the defendant asserts there was no evidence of racial discrimination and that the plaintiff was fired for improper cash handling that resulted in a large cash loss.  Doc. 17-1 at 42.  Plaintiff's termination notice states that he opened the safe and counted the money without a person to verify the count. Exhibit 3 to plaintiff depo., doc. 17-1 at 54.  According to that notice, the amount missing, $476.60, was equal to the first drop the night before.  *Id*.  That document states plaintiff was terminated for not following proper procedures, which resulted in the loss of $476.60.[12]  *Id*.  Fultz admits that, although he had no knowledge of other managers not following procedure, but if someone had not, it would not result in termination unless there was a large cash shortage.  Fultz depo. at 32-33.  He testified that as an operations manager with 76 stores under him, there are shortages every day, but rarely over $50.00.  Fultz depo. at 46-47.  When asked if other employees have been terminated for shortages over $50.00, Fultz responded, "If they didn't follow

---

[12]From a logical standpoint, not having a person there to verify the count could not have CAUSED the loss. Despite the lack of logic, the defendant asserted to the EEOC because there were no other significant shortages, no other manager committed the same or a similar offense as plaintiff.  Doc. 17-1 at 179.

11

procedure...”[13]  Fultz depo. at 47.   According to Lyons, plaintiff was terminated because the shortage was more than $20.00.  Neal depo. at 57-58.

No one was hired to replace the plaintiff.  Fultz depo. at 48-49.

## II. STANDARD OF REVIEW

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986); *Reeves v. C.H. Robinson Worldwide, Inc*., 525 F .3d 1139, 1143 (11th Cir.2008).  An issue is material of it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir.1997).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential

---

[13]There is no testimony as to whether plaintiff would have been terminated if he had followed procedures and $476. 60 was still missing when he opened the safe in the morning.

to that party' case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000). With these standards in mind, the court considers each of the plaintiff's claims.

### III.  LEGAL ANALYSIS

As there is no direct evidence of discrimination, the court applies the analysis required for circumstantial evidence. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d

1079, 1087 (11th Cir.2004).  *See also  McDonnell Douglas Corp. v. Green,* 411 U.S.

792, 93 S.Ct. 1817 (1973); *Texas Department of Community Affairs v. Burdine,* 450

U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981).

Plaintiff asserts that the above facts constitute race discrimination, hostile

environment and retaliation under 42 U.S.C. § 2000e and 42 U.S.C. § 1981. Whether

this case is pursuant to 42 U.S.C. § 2000e or § 1981, the same substantive proof is

required and it is analyzed under the same framework.  *See e.g., Bass v. Board of*

*County Com'rs, Orange County, Florida*, 256 F.3d 1095, 1109 n. 4 (11th Cir.2001);

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).

First, the plaintiff must establish a *prima facie* case of discrimination.

*McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824.  Establishment of a

*prima facie* case creates a presumption that the employer unlawfully discriminated

against the employee.  *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997).  Assuming the

employee meets this burden, the burden then shifts to the defendant to articulate a

legitimate, nondiscriminatory reason for the alleged discriminatory employment

action.  *Rojas v.  Florida,* 285 F.3d 1339, 1342 (11th Cir.2002); *Harris v. Shelby*

*County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996).  Once a defendant

presents a legitimate, nondiscriminatory reason for its action, the presumption of

discrimination drops from the case. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094 and n. 10.  The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather a mere pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

**A. Race Discrimination**:

To establish a prima facie case of race discrimination, the plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) the employer treated similarly situated employees outside the class more favorably; and (4) he was qualified to do his job. *See Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 842-43 (11th Cir.2000); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir.2000).  *See also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir.2011).  As an African-American, he is a member of a protected class.  Neither party disputes that the plaintiff was qualified to do his job.  According to defendant, the plaintiff cannot establish a prima facie case of discrimination because he cannot point to another manager who failed to have a cash count verified where the missing cash was more than $50.00 and that James Fultz knew it.  Defendant's memorandum, at 19.  The court finds the law does not require such a comparator.  Rather, the plaintiff must show a similarly situated employee who

15

was not African American, who was accused of similar misconduct and not terminated.[14]  *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.) *as modified by* 151 F.3d 1321 (11th Cir.1998).  The Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke–Fowler v. Orange Cnty., Fla*., 447 F.3d 1319, 1323 (11th Cir.2006) (quotation marks and brackets omitted).  In the facts before this court, the standard requires the plaintiff to point to another assistant manager who failed to double verify the cash count.  The court bases this finding on defendant's contention that the plaintiff was terminated for "a clear violation of company policy."[15]  Defendant's memorandum, at 1.

---

[14]In *Jones v. Gerwens,* the Eleventh Circuit stated, "we hold that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) he did not violate the work rule or (b) he engaged in misconduct similar to a person outside the protected class and that the disciplinary measures imposed were more severe....  The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facia* case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones*, 874 F.2d at 1540; citing *Chaney v Southern Railway Co.*, 847 F.2d 718, 723-724 (11th Cir. 1988).  Furthermore, the plaintiff must also show that the supervisor or foreman was aware of violations of rules by other employees and that the known violations were consciously overlooked.  *Jones*, 874 F.2d at 1542.

[15]From the defendant's pleadings, the court finds a reasonable conclusion can be drawn that had the plaintiff had a second employee watch him count the money, and the same amount had been missing, he would not have been terminated.

The plaintiff points to evidence which clearly suggests Kevin Leeper failed to have cash verified, failed to make a drop the previous evening, and yet was not terminated. This is sufficient for plaintiff to satisfy his prima facie burden. Thus, the defendant must set forth a legitimate non-discriminatory reason for its actions. The reason offered by an employer for an action "'does not have to be a reason that the judge or jurors would act on or approve' ... Instead, all that matters is that the employer advance an explanation for its action that is not discriminatory in nature." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269 (11th Cir.1999). Defendant claims the failure to follow procedures combined with the missing cash is a legitimate, non-discriminatory reason.

Given the defendant's reason, the burden shifts back to the plaintiff to produce evidence that the defendant's reason was not the true reason, but rather a pretext for discrimination. A plaintiff may show a pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005). In both instances, a plaintiff must show pretext with "concrete evidence in the form of specific facts." *Bryant*, 575 F.3d at 1308. Mere "conclusory allegations and assertions" will not suffice. *Id.* To demonstrate pretext, the plaintiff must meet the

employer's proffered nondiscriminatory reason "head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.2000). Even if the decision-maker's belief was not accurate, the plaintiff must show that the decision-maker knew the proffered reason was false in order to rebut the defendant's non discriminatory reason. See e.g., *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

The plaintiff points out that the evidence which could conclusively demonstrate that the previous evening's drop either was made or not made is "missing." The video of the safe, which would show Leeper placing or not placing money in it, has disappeared. Similarly, the drop sheet from the evening before plaintiff claims money was missing "disappeared." The video of plaintiff removing the money from the safe in the morning has vanished as well. The plaintiff states that if Leeper failed to make the drop, he should have been terminated, but was not. Plaintiff's response, at 23. According to plaintiff, all the other managers in the store failed to follow the double verification procedure, but only he was terminated. While plaintiff is the only manager to be short a large sum of money in his morning count, plaintiff asserts the lack of evidence that Leeper ever put the money in the safe should have been considered by the defendant.

18

The defendant argues that because there were no other significant shortages, no other manager committed the same or a similar offense as plaintiff.  Doc. 17-1 at 179.   As previously noted, not having a person there to verify the count could not have caused the loss. Hence, defendant's assertion that plaintiff was terminated because of the size of the loss rings hollow.  If the money was not placed in the safe the evening before, then plaintiff' failure to double verify the cash had nothing to do with the money missing.  It is the failure to double verify, not the sum of missing money, that the plaintiff must show other, non African-American managers, did without termination.  The plaintiff has advanced evidence of the same, sufficient for a reasonable jury to find that the defendant's true reason for terminating the plaintiff was discrimination.

**Racial Harassment**

"[W]hen the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002) (internal quotation marks omitted). The same is true under § 1981. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir.2012).  To establish a hostile work environment claim, plaintiff must show that:

19

1) he belongs to a protected group; 2) he was subject to harassment; 3) that harassment was based on a protected characteristic; 4) the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"; and 5) defendant is responsible for the hostile environment under either a theory of direct or vicarious liability. *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir.2009) (quotation marks omitted).

In considering whether the harassment was sufficiently severe or pervasive, the law requires that the environment be both objectively and subjectively abusive. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.2002). The court must look at all the circumstances to determine whether an environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

According to plaintiff, the comments by Leeper concerning his race, such as calling him a "black African monkey" and "nigger," were made every time plaintiff and Leeper worked together. The Eleventh Circuit has recognized that

> The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country." *Green v.*

> *Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir.2006); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1269 (11th Cir.2008) (describing "racial slurs," including the term "monkey" that were used against an African–American employee); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir.2000) (citing "comparisons to slaves and monkeys" among other harassment as sufficient to create a jury question with respect to a racially hostile work environment), abrogated on other grounds by *White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345. "Given the history of racial stereotypes against African–Americans and the prevalent one of African–Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that" the use of monkey imagery is intended as a "racial insult" where no benign explanation for the imagery appears. *United States v. Jones*, 159 F.3d 969, 977 (6th Cir.1998) (addressing a selective prosecution claim); *cf. Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647–48 (7th Cir.2011) (describing contexts in which managers might use monkey imagery for legitimate workplace purposes).

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir.2012).

Plaintiff merely must show that defendant knew of the harassment and failed to stop it. *See e.g., Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir.2010). Plaintiff reported Leeper's actions to multiple managers, but Leeper's behavior never improved, which is sufficient to demonstrate Clark, Lyons, and Fultz were all aware of plaintiff's contentions concerning Leeper. Viewed in its totality, and in the light most favorable to the nonmoving party, the evidence before the court would allow a rational trier of fact to conclude Leeper's comments were severe or pervasive harassment, which the defendant failed to prevent or correct.

**Retaliation**

The plaintiff also alleges that his termination was in retaliation for his prior complaints of discrimination.  To establish retaliation for engaging in protected activity, the court again must use the *McDonnell-Douglas* burden shifting standard. The plaintiff must prove (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Gupta v. Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), citing *Farley v. Nationwide Mut. Ins*., 197 F.3d 1322, 1336 (11th Cir.1999).  *See also  Sullivan v. National Railroad Passenger Corp*., 170 F.3d 1056, 1059 (11th Cir.1999); *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir.1997).   The plaintiff "need not prove the underlying claim of discrimination which led to [his] protest," so long as "[]he had a reasonable good faith belief that the discrimination existed."  *Gupta,* 212 F.3d at 586, citing *Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th  Cir.1989)).

The court finds a reasonable jury could conclude that plaintiff was terminated in retaliation for his repeated complaints of harassment.  The court has evidence before it from which a trier of fact could rationally conclude that plaintiff repeatedly complained about Leeper's treatment of him, Clark, Lyons and Fultz failed to remedy

the harassment, and plaintiff was them terminated.[16]   The court also has evidence before it from which a trier of fact could conclude that the plaintiff and Leeper harassed each other, thus convincing the court that this issue retains genuine issues of material fact, properly left for resolution by a jury.

## CONCLUSION

Having considered the foregoing, and finding that summary judgment is due to be denied on all counts of the plaintiff's complaint;

It is hereby **ORDERED** by the court that the defendant's motion for summary judgment be and hereby is **DENIED.**

**DONE** and **ORDERED** this the 22nd day of October, 2013.

_____
INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE

---

[16]These managers claim plaintiff referred to Leeper as a "white devil."  The court has no evidence before it that Leeper ever alleged this until management launched an investigation into plaintiff's complaints against Leeper.